[Cite as *State v. Haley*, 2013-Ohio-4123.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2012-10-211 |
| | : | O P I N I O N<br>9/23/2013 |
| - vs - | : | |
| | : | |
| STEVEN J. HALEY, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2012-03-0460

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Charles M. Conliff, 5145 Pleasant Avenue, Suite 18, P.O. Box 18424, Fairfield, Ohio 45018-0424, for defendant-appellant

**S. POWELL, J.**

{¶ 1} Defendant-appellant, Steven J. Haley, appeals from his conviction in the Butler County Court of Common Pleas for felony murder. For the reasons outlined below, we affirm.

{¶ 2} On April 4, 2012, the Butler County grand jury returned an indictment against Haley charging him with one count each of child endangering and felony murder. The

charges stemmed from the death of James Robert Smith, the infant son of Haley's fiancé, Adrienne Wesley, a state-tested nurse's aide, after the child was found unresponsive in the couple's Butler County home during the early morning hours of February 27, 2012. The Hamilton County Coroner later concluded the child's death was a homicide due to a series of severe blunt impacts to his head and neck that caused significant brain swelling.

{¶ 3} Following a two-day bench trial, the trial court found Haley guilty on both charges. After finding Haley guilty, the trial court merged the charges for sentencing purposes and the state elected to proceed on the felony murder charge. The trial court then sentenced Haley to a mandatory and indefinite term of 15 years to life in prison. Haley now appeals from his conviction, raising a single assignment of error for review.

{¶ 4} THE STATE'S EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT TO SUPPORT CONVICTIONS FOR MURDER AND ENDANGERING CHILDREN.

{¶ 5} In his single assignment of error, Haley argues the state failed to provide sufficient evidence to support his felony murder conviction, a charge which was predicated on finding him guilty of child endangering. We disagree.

{¶ 6} Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing the sufficiency of the evidence, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 113, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Proof beyond a reasonable doubt is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." R.C. 2901.05(E).

{¶ 7} In evaluating the sufficiency of the evidence, a court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *State v. Howland*, 12th Dist Fayette. No. CA2006-08-035, 2008-Ohio-521, ¶ 31, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979). The credibility of witnesses is primarily a determination for the trier of fact, who is in the best position to observe the witnesses' demeanor, gestures and voice inflections. *State v. Benson*, 12th Dist. Butler No. CA2009-02-061, 2009-Ohio-6741, ¶ 13, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. "A reviewing court must not substitute its evaluation of witnesses' credibility for that of the trier of fact." *State v. Montoya*, 12th Dist. Clermont No. CA2012-02-015, 2013-Ohio-3312, ¶ 30.

{¶ 8} It is well-established that both circumstantial and direct evidence have the same probative value. *State v. Saunders*, 12th Dist. Fayette No. CA2012-03-006, 2013-Ohio-2052, ¶ 44; *State v. Robinson*, 12th Dist. Clinton No. CA2001-12-048, 2003-Ohio-1615, ¶ 15. In fact, in some instances, certain facts can be established only by circumstantial evidence. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 75; *State v. Crutchfield*, 12th Dist. Warren No. CA2005-11-121, 2006-Ohio-6549, ¶ 20. Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind. *State v. Ortiz-Bajeca*, 12th Dist. Butler No. CA2010-07-181, 2011-Ohio-3137, ¶ 20; *State v. Cranford*, 2d Dist. Montgomery No. 23055, 2011-Ohio-384, ¶ 38. A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence. *State v. Shannon*, 191 Ohio App.3d 8, 2010-Ohio-6079, ¶ 10 (12th Dist.).

{¶ 9} Haley was convicted of felony murder in violation of R.C. 2903.02(B), an unclassified felony. Pursuant to R.C. 2903.02(B), Ohio's felony murder statute, "[n]o person

shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." As noted above, the predicate offense for Haley's felony murder charge was child endangering under R.C. 2919.22(B)(1), a second-degree felony.

{¶ 10} To establish a violation of R.C. 2919.22(B)(1), the state must prove beyond a reasonable doubt "'(1) that the child is under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, (2) an affirmative act of abuse, and (3) which act was reckless, that is, perpetrated with heedless indifference to the consequences of the action.'" *State v. Burdine-Justice*, 125 Ohio App.3d 707, 713 (12th Dist.1998), quoting *State v. Bogan*, 2d Dist. Montgomery No. 11920, 1990 WL 80572, *3-*4; *see also State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 10. Child abuse has been defined as "an act which inflicts serious physical harm or creates a substantial risk of serious harm to the physical health or safety of the child." *Burdine-Justice* at 714; *State v. Moore*, 8th Dist. Cuyahoga No. 94446, 2011-Ohio-454, ¶ 10. Child abuse has also been described as "any form of cruelty to a child's physical, moral or mental well-being." *State v. Cooper*, 147 Ohio App.3d 116, 2002-Ohio-617, ¶ 16 (12th Dist.), quoting *State v. Ivey*, 98 Ohio App.3d 249, 258 (8th Dist.1994).

{¶ 11} In arguing his convictions should be reversed, Haley contends the facts here are analogous to those in *State v. Miley*, 114 Ohio App.3d 738 (4th Dist.1996), where the Fourth District Court of Appeals reversed a child endangering conviction on manifest weight grounds. However, since its release, numerous courts throughout the state, including this court, have found *Miley* provides limited precedential value due to its highly distinguishable facts. *See, e.g., State v. Villarreal*, 12th Dist. Butler No. CA2004-02-035, 2005-Ohio-1924, ¶ 21-24; *State v. Brooks*, 10th Dist. Franklin No. 00AP-1440, 2001 WL 1117464, *7 (Sept. 25,

2001). This includes the fact that, in *Miley*, there was no evidence the defendant was with the child when she was injured. *See State v. Hendrex*, 11th Dist. Trumbull No. 2009-T-0091, 2010-Ohio-2820, ¶ 42-46. The Fourth District has also distinguished its holding in *Miley* on the grounds the state could not establish a specific period of time during which the abuse occurred. *See State v. Meadows*, 4th Dist. Scioto No. 99CA2651, 2001 WL 803822 (Feb. 12, 2001). Therefore, based on its limited precedential value, we again find *Miley* to be distinguishable for not only is it clear the child's injury transpired during the early morning hours of February 27, 2012, it is equally clear Haley was the only adult with the child at that time. *See State v. Hall*, 11th Dist. Trumbull No. 2011-T-0115, 2012-Ohio-4336, ¶ 17.

{¶ 12} Relying on *Miley*, Haley initially claims his conviction must be reversed because the state failed to provide sufficient evidence that the child's injuries occurred "within a short time frame when [he] was the only possible abuser." The record, however, indicates the child was acting normally when Wesley left James with Haley to go to work at 3:00 p.m. After Wesley left for work, Kim Anderson, a childhood friend of both Haley and Wesley, arrived at the house with her two children ages three and seven. According to Anderson, James was acting normally throughout the entire day by either crying or sleeping.

{¶ 13} The state also presented evidence that James appeared normal when Wesley came home for her lunch break around 7:30 p.m. that evening. As Wesley testified, the child was "perfectly fine, fussy, ready to wake up because he heard me." Anderson also testified that she did not notice any problems with James when Wesley came home for her lunch break. A video recording taken from Wesley's cell phone at 7:15 p.m. confirmed this testimony. Wesley also testified she did not observe any marks on James' face at that time.

{¶ 14} Continuing, Wesley testified she called Haley around 11:00 p.m. to inform him that she was going to be working a double shift. During this time, Wesley testified that she heard James "fussing" in the background, but that Haley once again informed her the child

- 5 -

was "perfectly fine. He has his usual crying thing going on, but he'll calm down here in a little while." After learning Wesley was going to work a double shift, Anderson went home with her children. According to Anderson, prior to leaving that evening, James was crying "[l]ike he normally does, just a regular cry."

{¶ 15} After agreeing to work a double shift, Wesley and Haley then exchanged a series of text messages, none of which indicated anything was wrong with the child. However, Jayden Bell, Wesley's nine-year-old son, testified he was awoken in the "middle of the night" by James crying. Bell then testified that he went into his mother's room where he saw Haley bouncing the child on his knee and tossing him into the air. According to Bell, James was still crying "[b]ut he wasn't crying as bad as he was." Bell also testified that James looked fine and did not appear to have any injuries. Haley then told Bell to go back to bed and Bell complied. Thereafter, at approximately 3:00 a.m. that morning, Wesley called Haley and learned James had been crying, but that he was "done crying and now he was just gasping." Although not overly concerned, Wesley nevertheless decided to take her lunch break and go home to check on her son.

{¶ 16} Upon her arrival, Haley told Wesley that James was sleeping and not to wake him up because he had just calmed him down. Wesley then walked back to the bedroom when she heard James gasping "which was different than what I'm used to hearing." Flipping on the bedroom light, Wesley walked over to James and noticed that he had a gray-toned face and was not breathing. Finding only a slight pulse, Wesley told Haley to call 9-1-1 while she performed CPR. Bell also testified that he observed the child and that he did not look "that good." Paramedics later arrived and noticed a "red mark bruise" above James' right eye. James was then rushed to the hospital where he died two days later.

{¶ 17} An autopsy performed on the child revealed he had died as a result of numerous blunt impacts to the head and neck. These impacts had caused severe

hemorrhaging to the spinal cord, retinas, and swelling of the brain. The autopsy also revealed the child suffered from a fractured rib. According to Dr. Jennifer Schott, a Deputy Coroner and Forensic Pathologist with the Hamilton County Coroner's Office, the severe injuries James sustained were a result of at least 11 impacts to the head and neck in what is commonly referred to as "shaken baby syndrome" or "shaken impact syndrome." Due to the severity of James' injuries, Dr. Schott opined the effects would have been "fairly immediately symptomatic." Dr. Schott also testified that some of the impacts could have occurred within two hours of the child being transported to the hospital, but that none of his internal injuries occurred any later than 12 hours prior.

{¶ 18} After a thorough review of the record, we find no error in the trial court's findings the child's injuries occurred during the early morning hours when entrusted solely to Haley's care. As noted above, James appeared normal and was acting "perfectly fine" until approximately 3:00 a.m. when Haley informed Wesley that the child had been crying and was now "just gasping." This was confirmed by Bell, Wesley's nine-year-old son, who testified that the child appeared fine and did not have any injuries when he was awoken in the middle of the night by James crying. Paramedics also observed a bruise above James' right eye that was not there previously. Due to the severity of James' injuries, Dr. Schott determined that the effects would have been "fairly immediately symptomatic." It is undisputed that Haley was the sole caregiver for James during all times relevant. This evidence, therefore, was more than sufficient to support the trial court's findings.

{¶ 19} Next, Haley claims his conviction must be reversed because the trial court erred by "ruling out other adults or children as the perpetrator[.]" However, as noted above, the overwhelming evidence indicates Haley was the sole caregiver at the time the child suffered his injuries. Moreover, there is no evidence that anyone other than Haley could have harmed the child. As Dr. Schott testified:

Q:     And along kind of the same lines there have been some suggestion, not evidence, but maybe more innuendo that there might have been children that were around James near the time he sustained the injuries. Could a child playing with the baby or rough-housing with the baby cause the injuries that you saw to James?

A:     No, I don't believe so.

Q:     And why would that be?

A:     These are very severe head injuries.

Q:     And what kind of force would be required to cause, particularly the head injuries and other injuries that you saw to James?

A:     A significant amount of force would be required.

{¶ 20} Continuing, Dr. Schott also testified that the child's injuries could not be caused by inappropriately tossing the child or by dropping him on the floor.

Q:     * * * Assuming the worst case scenarios, if someone would have dropped him on the wooden edge of this crib, the mobile is thrown at him, the toy was thrown at him, he was over tossed in the air, does that change your opinion with regard to the manner of death in this case?

A:     No.

Q:     And why is that?

A:     The internal injuries are not caused by those types of impacts. The internal injuries of the head and neck are far more severe than those types of injuries.

Q:     And the severity of the injuries, is that reflected in the force of what caused the injuries?

A:     Yes.

Q:     Could you explain that, please?

A:     All of the possible scenarios that were presented would most likely result in bruising of the skin, so when I say that they could result in some of the injuries, I'm referring to the bruises of the skin, but the internal injuries don't happen with everyday mishaps.

{¶ 21} In addition, Dr. Kathi Makoroff, a physician at Cincinnati Children's Hospital and expert in the field of child abuse pediatrics, testified that James had a "very, very severe head injury" with swelling of his entire brain and "very extreme" retinal hemorrhaging in both of his eyes. According to Dr. Makoroff, the injuries James sustained were reminiscent of a motor vehicle accident and not merely a household fall or something that occurred over an extended period of time. Furthermore, Wesley and Anderson, the only other adults who had any contact with James that day, specifically denied harming the child.

{¶ 22} It is well-established that "the credibility of witnesses is to be judged by the trier of fact." *State v. Rogg*, 12th Dist. Clermont No. CA94-05-033, 1994 WL 704912, *1 (Dec. 19, 1994), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Moreover, although there is no direct evidence linking Haley to the crime, "it is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained." *State v. Woodson*, 8th Dist. Cuyahoga No. 85727, 2005-Ohio-5691, ¶ 53; *State v. Nasser*, 10th Dist. Franklin No. 02AP-1112, 2003-Ohio-5947, ¶ 70-79. That is exactly what occurred here. Again, the overwhelming evidence presented by the state was more than sufficient to support the trial court's finding Haley was the perpetrator. *See, e.g., State v. Stacy*, 12th Dist. Warren No. CA2006-02-021, 2007-Ohio-6744, ¶ 66 (finding state presented sufficient evidence to support murder charge where state presented testimony of medical experts who testified that the child's injuries were the result of shaking and abuse); *see also State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 60; *State v. Batich*, 11th Dist. Ashtabula No. 2006-A-0031, 2007-Ohio-2305, ¶ 34-37; *State v. Munici*, 8th Dist. Cuyahoga No. 52579, 1987 WL 20206 (Nov. 19, 1987).

{¶ 23} Finally, Haley argues that the trial court erred by finding Wesley did not cause

the child's injuries while she performed CPR. In support of this claim, Haley argues that Wesley is merely a state-tested nurse's aide who was otherwise not trained, tested, or permitted to perform CPR as part of her job functions. However, regardless of whether she was permitted to perform CPR at work, Wesley specifically testified that she was trained in CPR. As Wesley testified when being cross-examined by Haley's trial counsel:

> Q:　　And you are trained in giving CPR, is that fair?
>
> A:　　Yes, sir.

{¶ 24} In fact, Haley himself even admitted during the 9-1-1 call that Wesley knew how to perform CPR. As Haley stated:

> OPERATOR: Okay. She knows how to do CPR and all that?
>
> THE DEFENDANT: Yes.
>
> OPERATOR: Okay. That is the main reason I was keeping you on the phone to know if we would have to do CPR.

{¶ 25} Furthermore, when asked if the injuries could be caused by providing CPR, most notably James' rib fracture, Dr. Schott explicitly stated that it could not. As Dr. Schott testified:

> This fracture was actually of the back of the ribs, so the part of the rib that is next to the vertebral columns. That location is not consistent with CPR-induced fracture. Additionally, the rib itself we very seldom see any fractures of the first rib with CPR. The first rib is very small, and like I said close to the collar bone and doesn't usually get fractured with CPR.

{¶ 26} In addition, Dr. Makoroff also testified regarding the likelihood that James injuries were caused by providing CPR. As Dr. Makoroff stated:

> Rib fractures from CPR are not common, by any means. If somebody were to ask me well, could they be impossible, I would have to say no, they're not impossible to happen from CPR. But CPR is performed on the front of the rib cage. And the fact that this rib fracture was so far up almost under the shoulder blade back here and also in the back would make it not a place where I would expect it to have occurred from CPR.

{¶ 27} Besides providing a vague allegation insinuating Wesley may not have performed CPR properly, Haley submitted no evidence to dispute both Dr. Schott's or Dr. Makoroff's findings. As the trial court found, the evidence presented by the state indicating Haley was the perpetrator was "overwhelming." We agree with the trial court's findings. Therefore, as discussed more fully above, we find the state presented sufficient evidence to support Haley's felony murder conviction. Accordingly, Haley's single assignment of error is overruled.

{¶ 28} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.