[Cite as *State v. Eacholes*, 2014-Ohio-3993.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2013-11-195 |
| | : | O P I N I O N |
| - vs - | | 9/15/2014 |
| | : | |
| JERRY JERMAINE EACHOLES, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2012-12-1910


Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Charles M. Conliff, P.O. Box 18424, Fairfield, Ohio 45018-0424, for defendant-appellant


**RINGLAND, P.J.**

{¶ 1} Defendant-appellant, Jerry Jermaine Eacholes, appeals his conviction in the Butler County Court of Common Pleas for murder, aggravated burglary, and aggravated robbery. For the reasons discussed below, we affirm.

{¶ 2} On the evening of November 24, 2012, Julian Slaven was shot by burglars at his home in Fairfield, Ohio, and died shortly thereafter. Less than two weeks later, Eacholes and four others – Christia Frymire, Anthony Givens, Joseph Goodin, and Misty Williams –

were indicted for murder, aggravated burglary, and aggravated robbery for the events at the Slaven home. Givens, Goodin, and Williams eventually entered guilty pleas. Eacholes and Frymire continued to maintain they were not guilty, and their causes proceeded to separate jury trials.

{¶ 3} The state's first witness at Eacholes' trial was Williams. According to Williams, she, Eacholes, Frymire, Goodin, and Nicholas Lovell, met up at a club on the evening of November 22, 2012. They spent most of the next two days together drinking, smoking marijuana, and snorting heroin. By the early afternoon of Saturday, November 24, she, Goodin, and Lovell recognized they were nearly out of money. A few hours later, Williams overheard a conversation about money between Goodin, Lovell, and Eacholes, during which they discussed the possibility of committing a robbery. Williams and Frymire inserted themselves into the conversation and suggested a few potential targets. The group eventually agreed to rob Slaven, a small-time drug dealer and Williams' former high school sweetheart.

{¶ 4} Williams testified that she then sent Slaven a text message to arrange a drug purchase. Slaven responded quickly, but indicated he would not be available until later that evening. Thereafter, the group went to Eacholes' residence on Ross Avenue in Hamilton where they were joined by Givens. It was there that the specifics of the plan for the robbery began to come together.

{¶ 5} By Williams' account, the plan was for Williams and Frymire to meet Slaven at his home to purchase drugs, while Eacholes, Goodin, Givens, and Lovell waited outside. Williams stated that once she and Frymire were admitted into Slaven's home, she was then supposed to call Lovell to signal that they were ready for the robbery to begin. At the same time, Frymire was supposed to text Eacholes to tell him how many people were in the house. After the signal had been given:

[Williams]: * * * Anthony Givens and Joseph Goodin were going to enter the resident [sic] with a - - Joe was going to have the - - gun in the back of [Frymire] while I sat in [Slaven's] room. And they were going to come up the stairs and make it look like a robbery that me and her had nothing to do with. And that [Goodin] and [Givens] were going to basically do like a stickup, scare [Slaven]. And [Eacholes] was going to come in and they were going to rob [Slaven] for everything he had.

* * *

[Prosecution]: So that was the plan?

[Williams]: That was the plan.

{¶ 6} Williams also testified as to what actually transpired during the robbery, and how it ended in murder. Williams testified that on the night of the robbery, she rode in a van with Eacholes, Frymire, Goodin, Givens, and Lovell from Eacholes' residence to Slaven's house, with a brief stop at her apartment in between to pick up latex gloves. After she and Frymire entered Slaven's house, and in accordance with the plan, she made a call on her phone to signal that she was ready for the robbery to begin. While she was on her phone, Williams observed that Frymire appeared to be sending a text message from Frymire's phone.

{¶ 7} Williams further testified that after Givens and Goodin entered the home and threatened Slaven, Slaven tried to defend himself and was shot by Goodin. Williams stated that she and Frymire fled immediately, and that she saw Eacholes right by the door as she ran out of the house. Williams recalled that as she got in the back seat of the vehicle, Eacholes got in on the passenger side. Once all of the passengers were back in the vehicle and they started to pull away, Williams noted that Givens had a jar of marijuana in his hands. She said Eacholes, Goodin, and Givens divided that marijuana between themselves when the group returned to Eacholes' residence on Ross Avenue.

{¶ 8} The state called several other witnesses to corroborate Williams' account of

Eacholes' role in the robbery and murder. Included among them was Paula Papke, a custodian of cell phone records for Cincinnati Bell, called to authenticate records for phone numbers registered to Slaven, Williams, and Frymire, respectively. Papke also authenticated records for two phone numbers registered to Edith Nicole Willis, Eacholes' former girlfriend and the mother of his children. Eacholes stipulated as to the authenticity, but not the admissibility, of the records.

{¶ 9} The cell phone records disclosed a number of things. The records revealed that Williams and Slaven traded several text messages beginning on the afternoon of November 24, 2012. They showed that, consistent with the plan described by Williams, a text message was sent at the approximate time of the Slaven robbery from a phone number registered in Frymire's name to a phone number registered in Willis' name that was allegedly Eacholes' number. They demonstrated that several times prior to and after the murder, Willis had attempted to contact Eacholes at the same number that Frymire texted around the time she and Williams were in Slaven's home. And they showed that the phone number alleged to be Eacholes' was changed on November 25, 2012, the day following the robbery and murder.

{¶ 10} In addition, the state presented the testimony of Phillip Cook, a witness who arrived at Slaven's home during the robbery and was standing on Slaven's front porch as Givens and Goodin exited the house. Cook stated that when he pulled up to Slaven's home, he noticed two females leaving the house and heading toward a mini-van, as well as a male who had been in Slaven's front yard and who followed the girls to the vehicle. He indicated that the vehicle began moving so soon after the passengers got in that it was unlikely the male in the front yard or either of the two females would have been driving. Cook could not positively identify Eacholes as the male who had been in the yard. Yet, to explain his inability to make a positive identification, the state presented extensive evidence about the dim

- 4 -

lighting in front of the Slaven home.

{¶ 11} Further, the state presented testimony of several witnesses suggesting a link between Eacholes and the jar of marijuana that Williams claimed Givens had stolen from Slaven. Officer Ryan Fleenor testified that in the weeks after Slaven's murder, he had been involved in executing a search warrant at Eacholes' residence. Officer Fleenor indicated that he found two glass jars in a trash can behind the residence. A series of experts from the Bureau of Criminal Investigations ("BCI") then testified that there was blood on at least one of the jars that was consistent with Slaven's DNA. They also testified that there were latent fingerprints on the jar that matched those on Givens' fingerprint card.

{¶ 12} At the close of the state's case, Eacholes moved for acquittal under Crim.R. 29. After the trial court overruled the motion, Eacholes declined to call any witnesses on his behalf and the case went to the jury. The jury returned a verdict finding Eacholes guilty of murder, aggravated burglary, and aggravated robbery. He received consecutive sentences of 15 years to life in prison for the merged murder and aggravated robbery charges, and ten years in prison for the aggravated burglary charge.

{¶ 13} Eacholes now appeals, raising two assignments of error.

{¶ 14} Assignment of error No. 1:

{¶ 15} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING THE INTRODUCTION OF CO-CONSPIRATOR HEARSAY STATEMENTS WITHOUT THE STATE PRESENTING INDEPENDENT PROOF OF THE CONSPIRACY.

{¶ 16} In his first assignment of error, Eacholes asserts that the trial court committed reversible error when it admitted Williams' testimony regarding statements made by the other co-conspirators, namely Goodin, Givens, and Eacholes himself, as non-hearsay. Eacholes argues that under Evid.R. 801(D)(2)(e), the state was required to present independent proof that a conspiracy existed before a co-conspirator's statement could be introduced. He

believes that the state's failure to satisfy this requirement constituted an abuse of discretion, and a violation of his constitutional rights to due process and a fair trial. We disagree.

{¶ 17} A trial court has broad discretion in the admission and exclusion of evidence. *State v. Hall*, 12th Dist. Madison No. CA2007-02-005, 2008-Ohio-1889, ¶ 45, citing *State v. Finnerty*, 45 Ohio St.3d 104, 109 (1989). Therefore, a reviewing court will not disturb the ruling of the trial court as to the admissibility of relevant evidence unless an appellant can demonstrate both an abuse of discretion, and that he or she was materially prejudiced. *Id.* The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 18} Evid.R. 801(D)(2)(e) provides that a "statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 100. In order for the statement to qualify under this hearsay exclusion, the proponent of the statement must establish: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was in furtherance of the conspiracy. *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 108.

{¶ 19} There is no requirement that the defendant be charged with the crime of conspiracy in order to introduce out-of-court statements by co-conspirators under Evid.R. 801(D)(2)(e). *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). Nor is there a requirement that the actions constituting the conspiracy fit within the crimes contained in the conspiracy statute. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, at ¶ 105-106. Further, there is no requirement that the proof of the existence of a conspiracy be dispositive; the proponent

need only establish a prima facie case by admissible evidence which "'fairly raises a *presumption* or an *inference* of conspiracy.'" (Emphasis sic.) *State v. Bishop*, 12th Dist. Madison No. CA97-07-032, 1998 WL 684486, *9 (Oct. 5, 1998), quoting *State v. Martin*, 9 Ohio App.3d 150, 152 (11th Dist.1983); *see also State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 66 ("Independent proof of conspiracy merely requires that the [s]tate present evidence sufficient to raise the inference of conspiracy").

{¶ 20} While the requisite independent proof of a conspiracy may not have existed at the time Williams testified, we find that it was subsequently offered by the state. The premature admission of a statement of a co-conspirator under Evid.R. 801(D)(2)(e) is harmless error where the proponent subsequently supplies the requisite independent proof. *See State v. Lawson*, 9th Dist. Medina No. 10CA0052-M, 2011-Ohio-6683, ¶ 5; *State v. Carter*, 72 Ohio St.3d 545, 550 (1995) (the state had barely established that any relationship whatsoever existed between the conspirators at the time the co-conspirator's statement was admitted).

{¶ 21} Subsequent to Williams' testimony regarding the statements of co-conspirators, the state provided sufficient proof to raise the inference of a conspiracy as required by Evid.R. 801(D)(2)(e). In addition to the testimony about the group's plan for robbing Slaven that Eacholes now contests, Williams also testified regarding her firsthand knowledge of how the robbery and murder actually unfolded. During that testimony, Williams identified Eacholes as a passenger in the van headed to Slaven's house and placed him right outside the front door during the robbery and murder. Williams also witnessed Eacholes divvying up the stolen marijuana with Givens and Goodin.

{¶ 22} The state also provided proof from other sources. Eacholes stipulated to the authenticity, but not the admissibility, of the Cincinnati Bell cell phone records presented by the state at trial. Among other things, these records suggested communication between

Eacholes and Frymire by text message around the time the robbery and murder were transpiring. Eacholes now argues that these records were inadmissible both because they constitute hearsay and because the state did not provide evidence that Eacholes received the text messages. But Eacholes' challenge goes to the weight of the evidence, not its admissibility. *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 32. Because he stipulated to the authenticity of the records and they were therefore admitted, the jury was then free to believe or disbelieve Eacholes' defense that he was not the recipient of the text messages. *Id.* The jury, being in the best position to weight the credibility of the witnesses, chose to disbelieve it.

{¶ 23} Moreover, Phillip Cook testified that he saw a male in front of Slaven's house who joined the two females on their way to their vehicle. That testimony is consistent with Williams' account of the departure of Williams, Frymire, and Eacholes from the house. In addition, the testimony of several law enforcement officers and BCI investigators established that a glass jar found in a trash can behind Eacholes' residence contained both traces of blood consistent with Slaven's DNA and latent fingerprints identical to those on Givens' fingerprint card. This, too, is consistent with Williams' testimony.

{¶ 24} The independent proof of a conspiracy presented by the state subsequent to Williams' testimony was adequate to satisfy the requirements of Evid.R. 801(D)(2)(e). Therefore, the trial court did not abuse its discretion by finding that Williams' testimony regarding the plan for the robbery of Slaven was not hearsay, and admitting it into evidence as statements of co-conspirators.

{¶ 25} Eacholes' first assignment of error is overruled.

{¶ 26} Assignment of error No. 2:

{¶ 27} THE STATE'S EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT TO SUPPORT CONVICTIONS FOR MURDER, AGGRAVATED BURGLARY, AND

AGGRAVATED ROBBERY.

{¶ 28} In his second assignment of error, Eacholes argues that the state's evidence was not sufficient to support his conviction for murder, aggravated burglary, and aggravated robbery. He asserts that the state presented no direct or circumstantial evidence linking him to the crimes, or establishing beyond a reasonable doubt that he was aware of the plan to rob Slaven. We disagree.

{¶ 29} In reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Cox*, 12th Dist. Clermont No. CA2008-03-028, 2009-Ohio-928, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency of the evidence is a question of law, and the appellate court must be careful in its evaluation of the evidence not to substitute its own judgment of witnesses' credibility for that of the trier of fact. *State v. Haley*, 12th Dist. Butler No. CA2012-10-211, 2013-Ohio-4123, ¶ 6-7. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.* at ¶ 6, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Proof beyond a reasonable doubt is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E).

{¶ 30} After a thorough review of the record, we find that a reasonable jury could have found beyond a reasonable doubt that Eacholes was complicit in the offenses of murder, aggravated burglary, and aggravated robbery. As discussed above, the trial court, in its sound discretion, admitted Williams' testimony both implicating Eacholes in the planning of the robbery at Slaven's house, and placing Eacholes in the van on the way to Slaven's house and outside of Slaven's front door at the time of the robbery and murder. The state also

presented evidence that during the robbery, a text message was sent from Frymire's phone to a phone that Eacholes' former girlfriend had used to contact him in the days leading up to the robbery and on the evening of the robbery. Further, the state presented evidence that a glass jar spotted with Slaven's blood and containing Givens' fingerprints was found in a trash can behind Eacholes' residence.

{¶ 31} Eacholes' second assignment of error is overruled.

{¶ 32} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.