[Cite as *State v. Murray*, 2017-Ohio-949.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-16 |
| | | (C.P.C. No. 14CR-6044) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| John R. Murray, Jr., | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 16, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Barnhart Law Office, LLC,* and *Robert B. Barnhart*, for appellant. **Argued:** *Robert B. Barnhart.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, John R. Murray, Jr., appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty of three counts of aggravated trafficking in drugs and one count of aggravated possession of drugs. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed November 14, 2014, plaintiff-appellee, State of Ohio, charged Murray with four counts of aggravated trafficking of oxycodone in violation of R.C. 2925.03. Counts 1, 2, and 3 alleged violations under R.C. 2925.03(A)(1), selling or offering to sell the controlled substance, and the amount of oxycodone involved equaled or exceeded 5 times the bulk amount but was less than 50 times the bulk amount.

Count 4 alleged a violation under R.C. 2925.03(A)(2), preparing for shipment, and that the amount involved equaled or exceeded the bulk amount but was less than 5 times the bulk amount. Additionally, Counts 2, 3, and 4 contained a specification, pursuant to R.C. 2925.01, that the offenses were committed in the vicinity of a juvenile. Murray entered a plea of not guilty.

{¶ 3} At a jury trial commencing October 26, 2015, the state presented evidence that Murray participated in three controlled buys of narcotics with C.B., a confidential informant working with law enforcement after police caught C.B.'s wife purchasing drugs for C.B. C.B. agreed to work as a confidential informant in exchange for law enforcement not pursuing criminal charges against his wife. C.B. testified that prior to the time he began working as a confidential informant, he had purchased drugs multiple times through a man named Bobby Guy who would obtain the drugs from Murray's house, though C.B. did not know Murray personally prior to his work as a confidential informant.

{¶ 4} The three controlled buys correlate to Counts 1 through 3 of the indictment. C.B. testified that Guy served as a "middleman" between C.B. and Murray to arrange the first two buys. (Tr. at 300.) The first buy, correlating to Count 1 of the indictment, occurred on January 17, 2014. C.B. called Guy to arrange for a buy of oxycodone and Guy then arranged for Murray to sell the pills to C.B. Guy took C.B. to Murray's sister's house to complete the transaction, but C.B. testified that Murray was not present because he had to go to the hospital. However, Murray arranged for his son to deliver the pills to C.B., so the individuals present at the first controlled buy were C.B., Guy, Murray's son, and another individual named Carl Osgood, whom C.B. knew to be Guy's supplier. C.B. bought 98 pills of 30-milligram oxycodone during this transaction.

{¶ 5} The second buy, correlating to Count 2 of the indictment, occurred on February 7, 2014. Once again, Guy acted as the middleman arranging the buy and this time the transaction occurred at Murray's home. C.B. testified Murray was present for the second buy and that Murray entered his bedroom and returned with the pills. During this transaction, C.B. bought 83 pills of 30-milligram oxycodone. C.B. testified that a young child came into the kitchen to ask for a glass of water while C.B. was in Murray's home to purchase the pills.

{¶ 6} The third buy, correlating to Count 3 of the indictment, occurred on March 7, 2014. Guy was not involved in the third buy; instead, Murray called C.B. directly to arrange the buy while C.B. was working with police on an investigation into another individual, and law enforcement decided to pursue the opportunity for another controlled buy. When C.B. went to Murray's home, C.B. said there were "teenage kids in the kitchen," so he and Murray went into the bedroom to complete the transaction. (Tr. at 443.) C.B. said Murray retrieved the pills from a dresser in the bedroom. During this transaction, C.B. bought 100 pills of 30-milligram oxycodone.

{¶ 7} Additionally, law enforcement attempted to arrange a fourth buy with Murray but that transaction never occurred despite C.B. "fronting" Murray $100 for the pills. (Tr. at 188.) C.B. lied to police about giving money to Murray resulting in the Hilliard Police Department deactivating C.B. as a confidential informant for violating the terms of his agreement.

{¶ 8} Count 4 of the indictment relates to the execution of a search warrant on Murray's home. During the search of Murray's home, police discovered three firearms and a pill bottle in Murray's dresser. The pill bottle contained 114 pills of 5-milligram oxycodone.

{¶ 9} C.B. provided extensive testimony regarding each of the controlled buys. During his testimony, the state introduced several audio recordings, including audio recordings of the telephone conversations between C.B. and Guy arranging the first two buys and audio recordings of the actual controlled buys obtained from the wire C.B. wore during the transactions. The trial court admitted these recordings over defense counsel's objections.

{¶ 10} Several witnesses testified in Murray's defense. Stacie Murray, a home healthcare worker and Murray's ex-wife, testified that Murray became distraught after the death of his mother and began drinking heavily and acting irrationally. She also testified that the pills police found in Murray's home belonged to one of her patients and that she kept the pills in her possession at the patient's request.

{¶ 11} Murray's sister, Vicki Murray, testified she took Murray to the hospital on January 17, 2014 for a mental health evaluation because Murray had been drinking so

heavily and was so distraught after their mother's death that Vicki worried he may hurt himself.

{¶ 12} Finally, Darla Dalton, Murray's fiancée, testified that Murray was "very sad" and "irrational" in January 2014 following his mother's death. (Tr. at 1084.) Eventually, the state objected to the line of questioning regarding Murray's state of mind after defense counsel asked if Murray was "mentally challenged" during the time in question. (Tr. at 1096.) The state argued defense counsel was attempting to present an insanity defense through lay testimony, and defense counsel responded that the questioning related to the element of "knowingly." (Tr. at 1097-1104.) The trial court ultimately sustained the objection, noting none of Murray's character witnesses was present during any of the transactions and that even if they were, their lay testimony about his mental state nonetheless created "an issue." (Tr. at 1104.)

{¶ 13} At the agreement of the state, the trial court granted Murray's Crim.R. 29 motion for acquittal as it related to the juvenile specification in Count 4 of the indictment. The trial court denied the Crim.R. 29 motion with respect to all other charges.

{¶ 14} Following deliberations, the jury returned guilty verdicts on Counts 1, 2, and 3, as well as a guilty verdict on the lesser-included offense of aggravated possession of drugs on Count 4. At the conclusion of a December 10, 2015 sentencing hearing, the trial court sentenced Murray to an aggregate term of imprisonment of eight years and imposed a fine of $32,500. The trial court journalized Murray's convictions and sentence in a December 18, 2015 judgment entry. Murray timely appeals.

## II. Assignments of Error

{¶ 15} Murray assigns the following errors for our review:

> 1. The trial court erred when it admitted improper hearsay evidence.
>
> 2. Appellant's convictions were based on insufficient evidence.
>
> 3. Appellant's convictions were against the manifest weight of the evidence.
>
> 4. Appellant received ineffective assistance of counsel.

### III.  First Assignment of Error – Evidentiary Rulings

{¶ 16} In his first assignment of error, Murray argues the trial court erred in its evidentiary rulings.  More specifically, Murray argues the recordings of the telephone calls between C.B. and Guy were inadmissible hearsay.

{¶ 17} Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court.  *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 33, citing *State v. Bartolomeo*, 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 24.  An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 18} A statement is impermissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted.  Evid.R. 801(C) and 802.  However, pursuant to Evid.R. 801(D)(2)(e), "a statement is not hearsay if it was made by a co-conspirator during and in furtherance of the conspiracy."  *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 102.  "Statements of co-conspirators are not admissible under Evid.R. 801(D)(2)(e) * * * until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof."  *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545 (1995), paragraph three of the syllabus.  Additionally, " '[t]here is no requirement that the defendant be charged with the crime of conspiracy in order to introduce out-of-court statements by co-conspirators under Evid.R. 801(D)(2)(e).' " *State v. Johnson*, 10th Dist. No. 13AP-997, 2015-Ohio-3248, ¶ 104, quoting *State v. Eacholes*, 12th Dist. No. CA2013-11-195, 2014-Ohio-3993, ¶ 19.

{¶ 19} Murray asserts the state failed to present independent proof of a conspiracy between himself, C.B., and Guy sufficient to render the recorded telephone conversations admissible under Evid.R. 801(D)(2)(e).  We are mindful, however, that " '[i]ndependent proof of conspiracy merely requires that the State present evidence sufficient to raise the inference of conspiracy.' " *Johnson* at ¶ 104, quoting *State v. Croom*, 2d Dist. No. 25094, 2013-Ohio-3377, ¶ 66.  Further, while "independent proof" of the conspiracy "precludes a finding that the statement itself may be used to establish the existence of the conspiracy," we note, as Murray does in his brief, that the test of whether the proponent has established independent proof of the conspiracy applies at the time the testimony was elicited.  *Carter* at 550.  The proponent of the statement must first independently present

a prima facie inference of the *existence* of the conspiracy before seeking to elicit or introduce evidence in *furtherance* of the conspiracy under Evid.R. 801(D)(2)(e).  *Id.*

{¶ 20} Here, Murray argues there was no independent proof of a conspiracy between C.B., Murray, and Guy at the time the state sought to introduce the recorded telephone conversations between C.B. and Guy.  We disagree.  Prior to introducing the recorded telephone calls, the state presented the testimony of Special Agent Mark Rohrer of the Ohio Bureau of Criminal Investigation who summarized each of the controlled buys.  As to the first recorded controlled buy, Rohrer testified that C.B. called Guy to arrange to buy pills, that C.B., Guy, Osgood, and Murray's son were present during the actual transaction, and that C.B. purchased 100 pills for $2,600, though two pills were lost before C.B. exited the house.  Even though Murray was not present for the first controlled buy, Rohrer testified that surveillance officers saw Murray leave the house before the controlled buy took place.

{¶ 21} As to the second controlled buy, Rohrer testified that C.B. called Guy to arrange another buy, and Guy then "made arrangements to make a controlled buy at the residence of * * * Murray."  (Tr. at 179.)  During this transaction, C.B. bought 83 pills for $2,158.

{¶ 22} Though Murray acknowledges this testimony, he nonetheless argues this evidence shows only a conspiracy between C.B. and Guy, but not a conspiracy between C.B., Guy, *and* Murray.  However, Rohrer further testified that Guy acted as the "middleman," between C.B. and Murray, which Rohrer explained as "someone who acts as a go-between between the actual dealer and in this case an informant."  (Tr. at 192.) Rohrer specifically testified that at the beginning of the investigation, C.B. "was unable to go directly to Mr. Murray," so Guy would "middl[e] the deal" on behalf of the dealer and would receive a commission for connecting the buyer and the dealer.  (Tr. at 192.) Additionally, Rohrer testified that his investigation into Murray revealed that Murray would finance trips to Florida for Guy, Osgood, and Osgood's wife for them to purchase pills and bring back to Murray for him to sell.

{¶ 23} Rohrer also testified regarding the third controlled buy, in which Guy did not participate.  During this buy, Murray called C.B. directly and made arrangements for

C.B. to buy pills at Murray's home. C.B. went to Murray's house approximately 45 minutes after that conversation and purchased 100 pills for $2,600.

{¶ 24} The state introduced all of this evidence prior to admitting any of the telephone calls between C.B. and Guy. Rohrer's testimony regarding the roles that C.B., Guy, and Murray all played in the controlled buys raises the inference of a conspiracy to buy and sell drugs with C.B. as the buyer, Guy as the middleman, and Murray as the dealer. We agree with the state that this evidence presents independent proof of conspiracy "sufficient to raise the inference of conspiracy," such that the subsequently admitted recorded telephone conversations between C.B. and Guy were admissible as statements of co-conspirators under Evid.R. 801(D)(2)(e). *Johnson* at ¶ 104, 106-09. *See also United States v. Henley*, 360 F.3d 509, 513 (6th Cir.2004) (stating "[d]rug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell"). Accordingly, the trial court did not abuse its discretion in admitting the recorded telephone conversations between C.B. and Guy. We overrule Murray's first assignment of error.

## IV. Second Assignment of Error – Sufficiency of the Evidence

{¶ 25} In his second assignment error, Murray argues his convictions were not supported by sufficient evidence. More specifically, Murray argues there was insufficient evidence to convict him of Count 1 of the indictment as well as the juvenile specification accompanying Count 3.

{¶ 26} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

### A.  Count 1 – Aggravated Trafficking of Drugs

{¶ 27} Count 1 of the indictment charged Murray with aggravated trafficking of oxycodone.  This count related to the first controlled buy.  R.C. 2925.03(A)(1) provides that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance."  Oxycodone is a Schedule II controlled substance.  *State v. Howard*, 10th Dist. No. 15AP-444, 2016-Ohio-7125, ¶ 18, citing R.C. 3719.01(C) and 3719.41(Schedule II)(A)(1)(n).  In turn, R.C. 2925.03(C)(1)(d) provides that "[i]f the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount," the offense is a second-degree felony and carries a mandatory prison term.

{¶ 28} Murray does not contend that the substance sold to C.B. was not oxycodone, nor does he challenge the amount sold.  Instead, Murray argues that the state failed to demonstrate that he participated at all in the controlled buy relating to Count 1 of the indictment.  Murray's argument is premised on the undisputed fact that he was not present during the first controlled buy.  However, during the telephone conversations between C.B. and Guy arranging the details of the first controlled buy, Guy told C.B. that Murray was going to the hospital to receive a mental health evaluation but that he had arranged for C.B. and Guy to complete the transaction without him being present.

{¶ 29} Murray again argues that the telephone conversations include impermissible hearsay and that without them the state has failed to demonstrate that Murray participated in the first controlled buy.  However, we already determined in our resolution of Murray's first assignment of error that the trial court properly admitted the recordings of the telephone conversations between C.B. and Guy.  Accordingly, the state presented legally sufficient evidence to establish the elements of aggravated trafficking of drugs related to Count 1 of the indictment.

### B.  Count 3 – Juvenile Specification

{¶ 30} Murray next argues there was insufficient evidence to support the juvenile specification attached to Count 3, which relates to the third controlled buy.  Pursuant to R.C. 2925.03(C)(1)(d), the penalty for aggravated trafficking of drugs enhances to that of a first-degree felony with mandatory prison time if the offender commits the crime "in the vicinity of a juvenile."  Under R.C. 2925.01(N), a juvenile is "a person under eighteen years of age."

{¶ 31} Murray asserts the only evidence presented pertaining to the juvenile specification on Count 3 was C.B.'s testimony that there were some "teenage kids in the kitchen," so he and Murray went into the bedroom to complete the transaction.  (Tr. at 443.)  Because a teenager encompasses not just juveniles aged 13 to 17, but also non-juveniles aged 18 and 19, Murray argues the state failed to present sufficient evidence that offense was committed in the vicinity of a juvenile.

{¶ 32} Construing the evidence in a light most favorable to the state, as we must, we find there is sufficient evidence to support the juvenile specification.  Though we acknowledge Murray's argument that a teenager could refer to an 18 or 19-year-old individual, we are particularly mindful that C.B. testified to the presence of "teenage kids," not merely to the presence of "teenagers."  Considering C.B.'s testimony in the context in which it was offered, C.B. also indicated that the presence of the "teenage kids" was the reason he and Murray moved the transaction to the bedroom.  Taken all together, C.B.'s testimony was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that juveniles were in the vicinity during the offense.

{¶ 33} For these reasons, we conclude sufficient evidence supports Murray's convictions for aggravated trafficking of drugs as stated in Count 1 and for the juvenile specification attached to Count 3.  We overrule Murray's second assignment of error.

## V.  Third Assignment of Error – Manifest Weight of the Evidence

{¶ 34} In his third assignment of error, Murray argues the manifest weight of the evidence does not support his convictions.

{¶ 35} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict.  *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387.  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."  *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  Determinations of credibility and weight of the testimony are primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  Thus, the jury may take note of the inconsistencies and resolve them accordingly,

"believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 36} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

## A. Count 1 – Aggravated Trafficking of Drugs

{¶ 37} Murray argues his conviction of aggravated trafficking of drugs under Count 1 is against the manifest weight of the evidence because it was based entirely on conversations between a confidential informant and a third party, and there was no physical or forensic evidence connecting him to the first controlled buy.

{¶ 38} "[A] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence." *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence despite the lack of physical evidence).

{¶ 39} The recorded telephone calls between C.B. and Guy clearly establish Murray's role in the first controlled buy despite the fact that he was not physically present when the transaction occurred. Additionally, C.B. and Rohrer testified about the details of the first controlled buy and stated that Murray was not present because he was at the hospital but arranged for his son to complete the transaction. The jury did not lose its

way in assessing the credibility of this testimony or in assigning weight to the recorded telephone conversations, and we conclude Murray's conviction for aggravated trafficking of drugs as stated in Count 1 is not against the manifest weight of the evidence.

### B.  Count 3 – Juvenile Specification

{¶ 40} Murray additionally argues under this assignment of error that his conviction of the juvenile specification attached to Count 3 was against the manifest weight of the evidence.  Specifically, Murray notes that C.B. did not elaborate on a description of the "teenage kids" present in the kitchen to allow a jury to reasonably believe the people present in the kitchen were juveniles.  However, C.B. presented enough contextual testimony for a reasonable juror to conclude that the "teenage kids" were, indeed, juveniles.  Murray provides no indication that the jury lost its way in assessing C.B.'s credibility other than simply disagreeing with the jury's conclusion.

{¶ 41} Considering all the evidence together, we cannot say the jury clearly lost its way in concluding the third controlled buy occurred in the presence of a juvenile.  After an independent review of the record, we find Murray's convictions are not against the manifest weight of the evidence.  We overrule Murray's third assignment of error.

## VI.  Fourth Assignment of Error – Ineffective Assistance of Counsel

{¶ 42} In his fourth and final assignment of error, Murray argues he was deprived of his constitutional right to the effective assistance of counsel.

{¶ 43} In order to prevail on a claim of ineffective assistance of counsel, Murray must satisfy a two-prong test.  First, he must demonstrate that his counsel's performance was deficient.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This first prong requires Murray to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  If Murray can so demonstrate, he must then establish that he was prejudiced by the deficient performance.  *Id.*  To show prejudice, Murray must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial.  *Id.* at 694.

{¶ 44} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Murray contends his trial counsel was ineffective in (1) presenting an impermissible defense despite the trial court warning counsel she could not present such a defense, and (2) eliciting unnecessary character evidence from defense witnesses which led to the admission of unfavorable character evidence from the state.

{¶ 45} Before trial, the trial court noted defense counsel's objection to its ruling that Murray's physician would not be allowed to testify that Murray was "just out of his mind" at the time of the offenses.  (Tr. at 34.)  Just prior to opening statements, defense counsel announced her intention to argue that her client did not know right from wrong at the time of the offenses.  The trial court informed defense counsel that she could not argue that Murray's intoxication rendered him not guilty and explained that its prior ruling regarding defense counsel's request for an expert witness was related to the intoxication argument.  This exchange prompted the state to note on the record that defense counsel was "in very dangerous waters of ineffective assistance of counsel" because defense counsel "has no idea what she's been talking about half the time."  (Tr. at 96.)  The state also noted its concern that the case would "automatically * * * be reversed just from what [defense counsel] is saying."  (Tr. at 96.)  The trial court then informed defense counsel it was not going to delay the matter so that defense counsel could seek a psychological evaluation of Murray, reminding defense counsel again that intoxication was not a defense.

{¶ 46} Subsequently, but still prior to opening statements, defense counsel moved for a mistrial on the basis that "Murray may want to modify his plea to a not guilty by reason of temporary insanity."  (Tr. at 106.)  The trial court denied that motion, noting more than one year had passed since Murray's indictment, and stated it would not grant a mistrial just because "the defense is thinking maybe [insanity is] a defense that I should have offered close to a year ago."  (Tr. at 109.)

{¶ 47} Despite this long discussion prior to opening statements, defense counsel proceeded to call three character witnesses to testify about Murray's state of mind during the time of the offenses.  Murray argues this testimony was not only irrelevant, but it opened the door for the state to cross-examine witnesses about unfavorable examples of

Murray's character.  Cumulatively, Murray argues his counsel's entire performance at trial "provided nothing of value to [the] jury."  (Murray Brief at 23.)

{¶ 48} Despite Murray's arguments, we need not determine whether defense counsel's attempts to introduce a state of mind defense or presentation of character witnesses at trial amounted to a deficient performance because, even if it was, Murray does not show any prejudice from counsel's performance at trial sufficient to satisfy the second prong of the *Strickland* test.  *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 60 (noting that "while counsel may not have exercised the best judgment * * *, appellant cannot demonstrate that this decision, even if indicative of a deficient performance, amounted to prejudice under the second prong of *Strickland*"), citing *Conway* at ¶ 102.  The evidence the state presented against Murray was sufficient to sustain the jury's verdicts, and Murray does not explain how his trial counsel's performance would have changed the outcome.

{¶ 49} Because Murray is unable to demonstrate the requisite prejudice under the second prong of *Strickland*, he has not established a claim of ineffective assistance of counsel.  Accordingly, we overrule Murray's fourth and final assignment of error.

## VII.  Disposition

{¶ 50} Based on the foregoing reasons, the trial court did not abuse its discretion in making its evidentiary rulings, the sufficiency and manifest weight of the evidence support Murray's convictions, and Murray did not receive ineffective assistance of counsel.  Having overruled Murray's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.