[Cite as *State v. Madden*, 2024-Ohio-2851.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


STATE OF OHIO,                                    :

    Appellee,                                    :          CASE NO. CA2023-10-117

    - vs -                                           :          O P I N I O N
                                                               7/29/2024
                                                 :

TOBY L. MADDEN,                                   :

    Appellant.                                   :



CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2022-10-1423



Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee.

Michele Temmel, for appellant.



**BYRNE, J.**

{¶ 1}  Toby Madden appeals from his conviction for aggravated possession of drugs in the Butler County Court of Common Pleas.  For the reasons discussed below, we affirm Madden's conviction.

## I. Factual and Procedural Background

{¶ 2}   In November 2022, a Butler County grand jury indicted Madden on one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a first-degree felony.  The indictment arose after Madden entered the public lobby of the Butler County Jail with two suitcases and told deputies that he knew where a large quantity of drugs was located.  However, Madden would not reveal the location of the drugs.  Eventually, the deputies asked for Madden's consent to search one of his suitcases, which he granted.  In that suitcase, the deputies recovered over 300 grams of methamphetamine.

{¶ 3}   The deputies confiscated the methamphetamine but did not arrest Madden in the hopes that he would work with them as a confidential informant and eventually tell them how he obtained the drugs.  However, he never contacted them again and they eventually charged him with possessing the drugs.

{¶ 4}   The matter proceeded to a jury trial.  We will summarize the key trial testimony below.

### A. State's Case

### 1. Specialist Donald Shackelford's Testimony

{¶ 5}   Specialist Donald Shackelford testified that he worked for the Butler County Sheriff's Office, and that on September 23, 2021, he was at the Butler County Jail.  He was leaving for the day when a man—Madden—approached him in the jail's public lobby.

{¶ 6}   Madden had two rolling "carry-on" suitcases with him.  Madden started talking excitely to Specialist Shackelford; he was "rambling."  Madden told Specialist Shackelford that there were people out to "get him" and that he had been walking around for several hours and decided to come to the jail.  Madden told Specialist Shackelford that he wanted to talk to someone at the sheriff's office because he had information on "big-time players" involved in drug trafficking.

- 2 -

{¶ 7}   After speaking with Madden, Specialist Shackelford placed a call to the sheriff's office "BURN" unit, which oversees drug investigations.  A BURN unit employee informed him that the unit would send someone over.  Ten minutes later, two officers from the BURN unit, Deputy Rhoads and Detective McGuire, appeared and took over the investigation.

{¶ 8}   Specialist Shackelford stated that his conversation with Madden lasted five to ten minutes and that Madden was "a hundred miles an hour, rambling about a bunch of different stuff."  He was talking "really fast," was fidgety, and paranoid.  Shackelford stated that he had observed this kind of behavior throughout his law enforcement career and that it appeared to him that Madden was under the influence of methamphetamine.

**2. Detective Michael McGuire's Testimony**

{¶ 9}   Detective Michael McGuire testified that he worked for the Butler County Sheriff's Office's BURN unit, which is the regional undercover narcotics task force.  Detective McGuire explained that the BURN unit uses confidential informants ("C.I.s") to help in their drug trafficking investigations.  Detective McGuire explained that they would sometimes not charge a person with a lower-level drug offense.  Instead, they would offer that person an opportunity to become a C.I. and "work off" the charge by making controlled purchases from drug traffickers.  But if the potential C.I. refused to cooperate with the BURN unit, then they would charge the person.

{¶ 10}  Detective McGuire testified that he was working on September 23, 2021 when Deputy Rhoads was informed that there was someone in the jail lobby who claimed to have information on drugs and a possible drug dealer.

{¶ 11}  Detective McGuire and Deputy Rhoads then met with Madden in the lobby and observed that he had two suitcases with him.  Madden told them that people were out to get him and that he was scared for his life.  Madden was "very paranoid."  Madden

told them that he knew where a "large amount" of drugs was located. However, he would not answer their questions about the location of the drugs. He would only say, "I can't tell you."

{¶ 12} But several times, while telling the deputies that he could not tell them where the drugs were located, he simultaneously looked down toward one of the suitcases, and then back at the investigators. He would also grab the handle of that suitcase or take his hand off the handle while denying he knew the location of the drugs. It was "very apparent" to the deputies that there was something in the suitcase and Madden's body language was a "big tell."

{¶ 13} Eventually, the deputies asked Madden to come with them to a secure room within the jail and continue answering questions. He agreed. While in the secure room, Madden continued to talk to them in a rambling manner, jumping from one subject to another, and never answering their questions about why he claimed his life was in danger or where the drugs were located.

{¶ 14} After some time, Deputy Rhoads asked Madden if he would consent to a search of the suitcase he had been gesturing towards. Madden agreed. After opening the suitcase, the deputies observed a heat-sealed plastic bag containing a crystal substance. Without testing the substance, Detective McGuire was certain the bag contained methamphetamine. The bag had also been partially opened. The investigators conducted a field test on the contents of the package and it returned positive for methamphetamine.[1] Detective McGuire noted that the suitcase also contained clothing and various items that Madden indicated he would be selling on eBay.

{¶ 15} Detective McGuire testified that the amount of methamphetamine contained

---

1. The drugs were later tested by a chemist at a forensic laboratory and it was confirmed as methamphetamine. The chemist testified at trial.

in the package was 315.8 grams, or about 11 ounces. The package containing the methamphetamine was one that typically would contain one pound of methamphetamine. Thus, the fact that the package was open indicated to Detective McGuire that a portion of the methamphetamine had been removed. Detective McGuire believed that in September 2021, the methamphetamine remaining in the package would have been worth between $2,000 and $2,500.

{¶ 16} Detective McGuire stated that he and Deputy Rhoads tried to recruit Madden to work for them as a C.I. However, "the conversations [with Madden] were so far all over the place." They decided to give Madden a "couple days" to "come down, possibly off his high" so that they could then obtain more accurate answers to their questions about where the drugs came from. And so they decided against arresting Madden. Their hope was they would later meet with him, find out where the drugs came from, and see if he would be willing to "work off" the possession charge.

{¶ 17} They exchanged contact information with Madden. Then, Deputy Rhoads gave Madden a ride to a location of his choosing, which was a hotel in Fairfield, Ohio. After dropping off Madden in Fairfield, they never heard from him again.

## B. Defense Case

{¶ 18} Madden testified in his defense.[2] Madden stated that in June 2021, two and a half months prior to his appearance at the Butler County Jail, he was living in Covington, Kentucky. One day, he entered his home and was shot by an unknown home intruder. He survived and after he was released from the hospital, he and his "wife," Rachelle, discussed their mutual concerns about him being in danger.[3] They agreed he should go

---

2. Madden's attorney placed on the record that he advised Madden against testifying, but Madden insisted.

3. Madden referred to Rachelle as his wife but also as his girlfriend. He claimed that they were together for 27 years.

into "hiding" after a vehicle with tinted windows pulled up in front of their home and a gun barrel was stuck outside the window. Madden never explained why he was in danger or who was trying to cause him harm.

{¶ 19} Madden testified that he left their home in Covington carrying only a gym bag. Subsequently, he called Rachelle and asked her to let him borrow her two travel suitcases. He asked her to pack some of his clothing in the suitcases and bring those suitcases to his "friend's place." She packed the suitcases and delivered them to his cousin's porch. The cousin lived in Hamilton, Ohio. The suitcases remained on the porch overnight.

{¶ 20} Madden explained that when he eventually retrieved the suitcases, he opened one so that he could change clothes. He then saw a "bag" that had been wrapped in a shirt. He did not recognize the bag. From the "looks" of the bag, "something wasn't right." His immediate thought was that he should contact the "Butler County Task Force" because he had seen them on the news. He thought that the safest thing to do would be to involve the "experts" (referring to the Butler County Task Force).

{¶ 21} So Madden placed a call to the Butler County Jail. Someone there gave him Deputy Rhoads' number. He called that number and spoke with Deputy Rhoads and explained that he was in danger and had found this bag, which he thought might contain drugs. Deputy Rhoads told him to bring the drugs to the jail and to contact him once he arrived.

{¶ 22} Madden stated that when he got to the jail, he spoke with an officer who tried to get him to explain the situation. Madden admitted that he might have appeared to be "rambling" but this was because he has a nervous condition that was maybe caused by post-traumatic stress disorder. He denied that he was under the influence of drugs and asserted that it was this "nervous condition" that the officer observed.

{¶ 23} Madden stated that he then met with Detective McGuire and Deputy Rhoads in the jail lobby and told them there that there were drugs in the suitcase. He testified that he showed them the drugs in the suitcase while still in the lobby. Then they took him to the secure room. He told the officers how the suitcases had sat on a porch overnight. They congratulated him on turning in the drugs and then drove him to in Fairfield, Ohio. Deputy Rhoads gave him a card and he gave Deputy Rhoads his brother's address and a phone number. But they never contacted him again. Madden denied that he ever agreed to work as a C.I. for the BURN unit.

{¶ 24} On cross-examination, Madden denied knowing that the bag contained methamphetamine, but admitted he suspected the bag might contain drugs. Madden also clarified that he did not pick up the suitcases from his cousin's porch in Hamilton. Instead, he stated that Rachelle first left the suitcases there overnight. Then, the next day, she picked up the suitcases and brought them to him. He could not state with certainty where he was located when Rachelle allegedly delivered the suitcases. He thought it could be at "Seven Mile" at his aunt and uncle's house. Or it could have been in "New Miami."

{¶ 25} As to his claim that Deputy Rhoads told him to bring the drugs to the jail, Madden was adamant that Deputy Rhoads refused to come to him to retrieve the drugs. He explained that Deputy Rhoads "didn't seem like . . . he believed that I had this big amount of . . . drugs and that I was wanting to turn them in."

{¶ 26} Madden also denied that Deputy Shackelford was the first deputy he met when he got to the jail. He said he spoke to a different deputy and told that person to contact Deputy Rhoads.

{¶ 27} Madden confirmed that the suitcase had been packed by Rachelle, his girlfriend of 27 years. He stated that "some" of the clothes in the suitcase were his, but

some were not.  He did not clarify which clothes were not or why some of the clothes would not have been his.

## C. Jury Verdict and Appeal

{¶ 28}  The jury found Madden guilty of aggravated possession of drugs.  The court accepted and entered the verdict.  The court sentenced Madden to a prison term. Madden appealed, raising one assignment of error.

## II. Law and Analysis – Sufficiency and Weight of the Evidence

{¶ 29}  Madden's sole assignment of error states:

> THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED POSSESSION OF DRUGS AND THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 30}  Madden collectively challenges the sufficiency of the evidence and the weight of the evidence supporting his conviction.  Madden's only argument is that the state failed to prove that he "knowingly" possessed methamphetamine.

## A. Applicable Law

{¶ 31}  When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.).  Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 32}  A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue

rather than the other." *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 33} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 34} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

### B. Analysis

{¶ 35} Madden argues that there was no evidence presented at trial to demonstrate that he knowingly possessed methamphetamine. He points to his trial testimony that he found something that did not belong in his suitcase and suspected it could be drugs or something illegal, and then took it to the sheriff's office. He emphasizes that he never acknowledged to any of the deputies his awareness that the plastic bag contained methamphetamine. He notes that police did not recover his fingerprints on the

plastic bag (and did not attempt to). He argues that he was never tested for being under the influence of methamphetamine. And he underscores the fact that the deputies did not immediately arrest him and instead gave him a ride.

{¶ 36} The jury found Madden guilty of aggravated possession of drugs (methamphetamine), in violation of R.C. 2925.11(A). In relevant part, that statute provides that no person shall knowingly obtain, possess, or use a controlled substance.

{¶ 37} As stated above, the only element of the state's proof challenged by Madden is whether the state demonstrated that he knowingly possessed methamphetamine.

{¶ 38} Pursuant to R.C. 2901.22(B),

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 39} "Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself." *State v. Hilton*, 2015-Ohio-5198, ¶ 20 (12th Dist.). "[T]he state can prove knowledge through either direct or circumstantial evidence." *State v. Jordan*, Slip Opinion No. 2023-Ohio-3800, ¶ 26. Circumstantial evidence is "'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts.'" *State v. Raleigh*, 2010-Ohio-2966, ¶ 46 (12th Dist.), quoting *State v. Wells*, 2007-Ohio-1362, ¶ 11 (12th Dist.).

### 1. Sufficiency of the Evidence

{¶ 40} Upon review, we find that the state submitted sufficient evidence to demonstrate that Madden had knowledge, as defined in R.C. 2901.22(B), that he possessed a controlled substance. The state's evidence was that Madden appeared at the Butler County Jail with two suitcases and began rambling to Specialist Shackelford about being in danger and claiming to have information on drug traffickers. Based on his years of experience as a law enforcement officer, Deputy Shackelford believed that Madden was under the influence of methamphetamine. Madden did not tell Specialist Shackelford anything about being instructed to bring a large quantity of suspected drugs to the Butler County Jail.

{¶ 41} When Madden was later questioned by the two BURN officers, he informed them that he knew where a large quantity of drugs was located. However, he refused to provide them any information about the location of these drugs. But while discussing his alleged lack of knowledge of the location of the drugs, Madden's body language revealed to the two officers that the drugs were likely in one of the suitcases. He repeatedly looked at this suitcase, or grabbed the suitcase, while refusing to answer their questions about the drug's location. Detective McGuire was certain there was something in the suitcase based on Madden's body language. In his words, Madden's body language was a "big tell."

{¶ 42} Subsequently, Madden allowed the officers to search his suitcase, and sure enough, the deputies found a bulk quantity of methamphetamine. The suitcase was also full of Madden's clothing as well as items that he indicated he intended to sell on eBay. The fact that the drugs were found in Madden's suitcase (which also contained his clothing), and his gesturing towards the suitcase while disclaiming knowledge of where the large quantity of drugs was located, would lead a reasonable fact finder to conclude that Madden knew that he a possessed a controlled substance.

{¶ 43} It is also relevant to knowledge that Madden was behaving in a manner that suggested he was high on methamphetamine. The package was not sealed and had been opened. It is not much of a stretch to conclude that Madden was high on methamphetamine that had previously been in the package and thus would have had knowledge that he possessed methamphetamine.

{¶ 44} Based on the "surrounding facts and circumstances," there was more than sufficient evidence to allow a reasonable factfinder to find, beyond a reasonable doubt, that Madden knowingly possessed a controlled substance. *See Hilton*, 2015-Ohio-5198 at ¶ 20.

### 2. Manifest Weight of the Evidence

{¶ 45} Madden's argument as to the weight of the evidence assumes that the jury was required to credit his trial testimony that he had no knowledge of what was in the plastic bag in his suitcase and that he simply went to the Butler County Jail to turn over the suspected drugs to the "experts." However, the jury was free to believe some, all, or none of Madden's testimony. *State v. Tenbrook*, 2020-Ohio-5227, ¶ 26. A conviction is not against the manifest weight of the evidence simply because the jury believed the state's witnesses and did not find the defendant credible. *See id*. at ¶ 25.

{¶ 46} It is apparent that the jury rejected Madden's version of events. This is not surprising. We have reviewed Madden's testimony and find that much of it lacks credibility. In Madden's version of events, he spoke with Deputy Rhoads on the phone and informed him of the large quantity of suspected drugs. But this is inconsistent with Specialist Shackelford's testimony that Madden appeared at the jail and asked to speak to someone about "big-time players" and never mentioned having previously spoken to Deputy Rhoads. To explain this inconsistency, Madden testified that he spoke with another deputy *before* speaking to Specialist Shackelford. And Madden told that deputy

to summon Deputy Rhoads. But if any of this were true, one would assume that Madden could have easily subpoenaed Deputy Rhoads to confirm it. Moreover, one would think that Specialist Shackelford would have heard from the BURN unit that they were expecting Madden and that Deputy Rhoads had already been summoned by a different deputy. Finally, one would assume that Detective McGuire would have been aware that his investigating partner had already talked to Madden on the phone.

{¶ 47} In Madden's version of events, he opened the suitcase and showed the drugs to the deputies while in the jail lobby. But of course, this was inconsistent with Detective McGuire's testimony that Madden repeatedly refused to reveal the location of the drugs and they only recovered the drugs after acquiring Madden's consent to search the suitcase in the secure room. Madden apparently felt the need to interject this inconsistency to prop up his claim that he entered the jail in order to comply with Deputy Rhoads' request that he come to the jail and turn in the drugs.

{¶ 48} Madden's narrative of the events leading up to his decision to enter the jail lobby was also not credible. Madden claimed that he was shot by an unknown person and was in danger. But he could never articulate why he was in danger or from whom he was in danger. And it was not believable that a bulk quantity of methamphetamine would randomly appear in Madden's suitcase, which suitcase was allegedly filled with his clothing and other personal items by his long-term girlfriend. If we assume that it is true that Rachelle left the suitcase overnight on a porch, it is not believable or sensical that some unknown individual would place a bulk quantity of methamphetamine in the suitcase for no reason.

{¶ 49} In sum, while Madden's motivations for entering the jail that day are not exactly clear (perhaps owing to his being under the influence at the time), what is clear is that he knew he possessed a large quantity of a controlled substance in a suitcase. This

is not one of the exceptional cases where the jury's verdict weighed heavily against the evidence. *Zitney*, 2021-Ohio-466 at ¶ 15. We overrule Madden's sole assignment of error.

### III. Conclusion

{¶ 50} Madden's conviction for aggravated possession of drugs was supported by sufficient evidence of his knowledge. And the state's proof of knowledge was supported by the greater weight of the evidence.

{¶ 51} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.