[Cite as *State v. Howe*, 2024-Ohio-5143.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-10-014 |
| | : | O P I N I O N |
| - vs - | | 10/28/2024 |
| | : | |
| JAMES HOWE, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. AD20230365


Jess Weade, Fayette County Prosecuting Attorney, and Andrew Sievers, Assistant Prosecuting Attorney, for appellee.

Steven H. Eckstein, for appellee.


**BYRNE, J.**

{¶ 1} James Howe appeals from his conviction for misdemeanor child endangering in the Fayette County Court of Common Pleas, Juvenile Division. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

{¶ 2}    In August 2023, a police officer filed a complaint in the Fayette County Court of Common Pleas, Juvenile Division, charging Howe with endangering children in violation of R.C. 2919.22(B)(1), a misdemeanor of the first degree.  The charge stemmed from allegations that Howe abused the minor victim, "William,"[1] by grabbing and squeezing William's face, leaving red marks.  Howe is the boyfriend of William's mother ("Mother").  William's father ("Father") brought the matter to the attention of police.

{¶ 3}    The matter proceeded to a bench trial in October 2023.  We will summarize the key trial testimony below.

### A. The Trial - State's Case

### 1. Father's Testimony

{¶ 4}    Father testified that William was born in September 2017 (meaning that he was five years old on the date of the injury at issue in this case and six years old at the time of trial).  Father was divorced from Mother.  Mother had custody of William and Father had weekly visitation with William from Thursday to Monday.

{¶ 5}    On Thursday, July 20, 2023, Father travelled to Mother's home in Fayette County to pick up William for his visitation time.  Father believed that only Howe was present during the exchange.  Father did not recall Mother being home.  He had no discussion with anyone and left with William.

{¶ 6}    Father testified that he did not notice anything wrong at the time of the pick-up, but he did notice that William was "messy," like he had been playing.  After Father and William arrived home, Father and his wife gave William a bath.  Father's wife pointed out that there was a bruise on William's face.  The bruise was on his cheek underneath his

---

1. "William" is a pseudonym adopted in this opinion for the purposes of privacy and readability.  *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

eye, and Father described it as a "pretty big, prominent bruise." There were two parts to the bruise, upper and lower.

{¶ 7} Father contacted the police department where he lived in Greene County. The police suggested he contact Fayette County. Father called Fayette County Children's Services but he did not receive a return call. Eventually, on July 22, Father took William to the police department in Fayette County, where the police took some photographs of William and said that they were going to report the incident to Children's Services.

{¶ 8} Father identified State's Exhibit 1, which was a photograph of William taken at the police station. The photograph consists of a profile view of the right side of William's face. Adjacent to William's mouth, in the cheek area, there are two prominent red marks, approximately penny-sized. One mark is on the same level as William's mouth and the other mark is slightly below this mark, even with his chin. Less prominent redness appears between the two prominent marks. It is apparent from the depth of the red color, as compared to the rest of William's face, that it would take significant force to leave such marks.

{¶ 9} Father stated that William complained that the bruise hurt and that it was sore for about three days. The bruise lasted for one week.

### 2. Patrolman Adam Rummer's Testimony

{¶ 10} Patrolman Adam Rummer testified that he was dispatched to meet with William and Father. He observed marks on William's right cheek and took a photograph. No bruising had set in at that time. The mark was dark red, not black and blue. Patrolman Rummer identified State's Exhibit 1 as the photograph he took.

{¶ 11} Patrolman Rummer directed Father to contact Children's Services. Later, after speaking with Children's Services, Patrolman Rummer filed a criminal summons for Howe.

### 3. Taryn Fraley's Testimony

{¶ 12} Taryn Fraley testified that she was an investigator for Fayette County Children's Services. Fraley was assigned to investigate William's case.

{¶ 13} Fraley met with Father and observed the marks on Wiliam's face on July 24, 2023. On that day, the marks were more "purple" than what was depicted in State's Exhibit 1.

{¶ 14} Fraley also interviewed Howe on July 24, 2023. Howe told her that he knew about the marks on William's face. Howe told Fraley that he was playing around with William and "squeezed" William's face but did not mean to squeeze as hard as he did. He said that it was an accident. Howe specifically said, "I squeezed his face playing around Taryn. You know I play around with him. It was an accident."

{¶ 15} Fraley also spoke to Mother, who at that time was incarcerated.[2] After Howe made his admissions, Mother agreed to a safety plan in which William would stay with Father.

{¶ 16} Fraley interviewed Howe a second time, with Mother present. Both told Fraley the same story that Howe had initially told Fraley—that is, that Howe was "playing around" with William and simply squeezed his face too hard.

### B. The Trial – Defense Case

{¶ 17} Howe testified in his defense. Howe stated that he was not present when Father picked up William on July 20. He said that he spent that week at the county fair but clarified that he was only at the fair during the day, not at night.

{¶ 18} Howe demonstrated how he would play with children's faces, referring to both William and his biological son. He admitted that he did leave marks on William's

---

2. On July 21, 2023, the day after Father picked up William, Mother and Howe were involved in a domestic violence incident that resulted in Mother going to jail.

face "one time," but he claimed that those marks only lasted two hours.

{¶ 19} When confronted with State's Exhibit 1, Howe agreed that what was depicted was consistent with abuse and that "It would take somebody to do it. Strong and heavy-duty to do it, bigger fingers. No small fingers, looks like to me." But he denied doing "it" and stated he did not know any reason why someone would do that to a child. He added, "it's not right for a little kid to go through that kind of abuse."

### C. Finding of Guilt and Appeal

{¶ 20} After hearing the evidence, the juvenile court found Howe guilty of misdemeanor child endangering as charged. Howe appealed, raising two assignments of error, which we will address together.

### II. Law and Analysis

{¶ 21} Howe's first assignment of error states:

THE TRIAL COURT ERRED IN FINDING THE DEFENDANT-APPELLANT GUILTY AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 22} Howe's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT FOUND THE DEFENDANT-APPELLANT GUILTY AS SUCH VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 23} Howe argues that the state failed to submit sufficient evidence of "abuse" to support his conviction for child endangering. Howe argues that R.C. 2919.22(B)(1)'s language making it a crime to "[a]buse [a] child," as interpreted by this court, requires evidence of an act that (1) inflicts *serious* physical harm or creates a substantial risk of *serious* harm to the physical health or safety of a child, or (2) involves any form of cruelty

to a child's physical, moral, or mental well-being. Howe argues that the injuries to William's face were "de minimis" and did not rise to the level of "abuse" as defined above. For the same reasons, Howe argues that his conviction was not supported by the greater weight of the evidence.

**A. Applicable Law**

{¶ 24} "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Madden*, 2024-Ohio-2851, ¶ 31 (12th Dist.), citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 25} "A manifest weight of the evidence challenge examines the 'inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *Madden* at ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 26} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289,

¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 27} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

**B. Analysis**

{¶ 28} R.C. 2919.22 defines the crime of endangering children. As relevant here, one of that statute's subsections, R.C. 2919.22(B), provides that "No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age: (1) Abuse the child; . . ." We have previously held that, in order to prove a violation of R.C. 2919.22(B)(1), the prosecution must prove beyond a reasonable doubt,

> (1) that the child is under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, (2) an affirmative act of abuse, and (3) which act was reckless, that is, perpetrated with heedless indifference to the consequences of the action.

(Cleaned up.) *State v. Haley*, 2013-Ohio-4123, ¶ 10 (12th Dist.), citing *State v. Burdine-Justice*, 125 Ohio App.3d 707,713 (12th Dist.1998). In this appeal, Howe solely challenges the second element—that is, whether the state proved that he abused William—so we do not need to address the first and third elements.

{¶ 29} The verb "abuse" is not defined in R.C. 2919.22(B)(1). "When a word is not defined in a statute, we look to its ordinary meaning—that is, how it would commonly be understood in the context in which it occurs." *State v. Allen*, 2019-Ohio-4757, ¶ 4 (2019).

When determining the ordinary meaning of a word that is not defined by statute, we may look to dictionaries for guidance. *Id.*; *Centerville v. Knab*, 2020-Ohio-5219, ¶ 24; *State ex rel. Internatl. Assn. of Fire Fighters, Local 1536, AFL-CIO v. Sakacs*, 2023-Ohio-2976, ¶ 17-18.

{¶ 30} R.C. 2919.22 was enacted in 1972. 1972 Am.Sub.H.B. No. 511. At the time, R.C. 2919.22(B)(1) stated that no person shall "torture or cruelly abuse the child." The version of *Black's Law Dictionary* then in use defined the verb "abuse" as "[t]o make excessive or improper use of a thing, or to employ it in a manner contrary to the natural or legal rules for its use; to make an extravagant or excessive use, as to abuse one's authority." *Black's Law Dictionary* (4th Ed. 1968). The version of *Webster's Dictionary* then in use defined the verb "abuse" as "to use so as to injure or damage: maltreat," and the noun "abuse" as "improper use or treatment" or "physical maltreatment." *Webster's New Collegiate Dictionary* (7th Ed. 1971).

{¶ 31} Taken together, these definitions refer to cruel or violent behavior or maltreatment that *may* include causing injury, but that does not necessarily *require* an injury, let alone "serious" injury. These definitions are consistent with the common usage of "abuse," as demonstrated by common experience.[3] See *Allen* at ¶ 4 (holding that we

---

3. Though the ordinary meaning of the verb "abuse" at the time R.C. 2919.22(B)(1) was enacted is what matters for purposes of determining the meaning of the statute, we note that the definitions we have cited above from the 1960s and 1970s are consistent with how the verb "abuse" is defined today. For example, the current version of *Black's Law Dictionary* defines the verb "abuse" as "[t]o damage (a thing)," "[t]o injure (a person) physically or mentally," and "[i]n the context of child welfare, to hurt or injure (a child) by maltreatment." *Black's Law Dictionary* (12th Ed. 2024). As relevant here, *Merriam-Websters Dictionary* now defines the verb "abuse" as "to use or treat so as to injure or damage." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/abuse (accessed Oct. 21, 2024). And the *Cambridge Essential American English Dictionary* now defines the verb "abuse" as "to be cruel and violent with someone." *Cambridge Dictionary Online*, https://dictionary.cambridge.org/dictionary/essential-american-english/abuse (accessed Oct. 21, 2024). Though these definitions are phrased differently than those from the 1960s and 1970s we quoted above, they are still consistent with those definitions. They are also consistent with common understanding and use of "abuse," which is a commonly-understood, non-technical word. The verb "abuse," therefore, has not materially changed in meaning since R.C. 2919.22 was drafted.

look to how words are commonly understood). For example, common experience suggests that, in a hypothetical scenario, the average person would describe a parent who intentionally strikes their child with a tire iron as having "abused" the child, regardless of whether the strike caused no injury, a minor injury (such as a small bruise on the child's arm), or a "serious" injury (such as a broken bone).

{¶ 32} We pause to note that the dictionary definitions cited above, our analysis of those definitions, and our understanding of common usage are consistent with our interpretation of "abuse" as used in R.C. 2919.22(B)(1) in *State v. Litton*, 2016-Ohio-7913 (12th Dist.). In *Litton*, we referred to the juvenile statutes and specifically R.C. 2151.031(D), which defines an "abused child" as one who "[e]xhibits evidence of *any physical or mental injury* or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." (Emphasis added.) *Litton* at ¶ 22. We also noted that the term "physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." *Litton* at ¶ 22, quoting R.C. 2901.01(A)(3). In citing this definition in *Litton*, we appear to have concluded that the term "physical harm" as defined in R.C. 2901.01(A)(3) was equivalent to the term "physical . . . injury" as used in R.C. 2151.031(D). We need not explore that issue now; rather, the important point is that our analysis regarding the ordinary meaning of "abuse" in this opinion is consistent with *Litton*'s conclusions regarding the meaning of "abuse."

{¶ 33} But, as stated above, Howe argues in part that it was necessary for the state to establish "*serious* physical harm" for purposes of demonstrating "abuse" pursuant to R.C. 2919.22(B)(1). (Emphasis added.) Howe is mistaken.

{¶ 34} First, the cases cited by Howe in support of this argument were all *felony* child endangering offenses. *State v. Haley*, 2013-Ohio-4123, ¶ 9-10 (12th Dist.) (defendant convicted of murder and felony child endangering); *State v. Cooper*, 2002-

- 9 -

Ohio-617, ¶ 14 (12th Dist.) (defendant convicted of involuntary manslaughter with child endangering as the predicate offense). The case before us, on the other hand, involves a conviction for misdemeanor child endangering, not felony child endangering.

{¶ 35} Second, the plain text of R.C. 2919.22 belies Howe's argument. R.C. 2919.22(E)(2)(a) states that endangering children in violation of R.C. 2919.22(B)(1) is a misdemeanor of the first degree, unless otherwise provided for in the section. R.C. 2919.22(E)(2)(d) provides that "[i]f the violation is a violation of division (B)(1) of this section and results in *serious* physical harm to the child," then the violation is a felony of the second degree. (Emphasis added.) Thus, the plain text of R.C. 2919.22 provides that proof of "serious" physical harm is required for a *felony* charge of endangering a child under R.C. 2919.22(B)(1) but proof of "serious" physical harm is *not* required for the *misdemeanor* charge for which Howe was convicted. *State v. Gravelle*, 2009-Ohio-1533, ¶ 48 (6th Dist.) (noting R.C. 2919.22[E][2][a] language and concluding that when a defendant is convicted of misdemeanor child endangering, the state is not required to prove "serious" physical harm); *State v. Shirey*, 2006-Ohio-256, ¶18 (9th Dist.) (same).

{¶ 36} Third, all the dictionary definitions of "abuse" that we discussed above undermine Howe's argument. None of those definitions require that the victim of abuse be "seriously" injured. Nor does common experience and usage of the word "abuse" support Howe's argument.

{¶ 37} Therefore, we conclude that to convict Howe on a charge of misdemeanor child endangering, the factfinder was not required to find that Howe caused "serious" physical or mental injury to William.

{¶ 38} Given the ordinary meaning of the term "abuse," the record contains sufficient evidence to prove that that Howe abused William, as prohibited by R.C. 2919.22(B)(1). Howe admitted grabbing and squeezing William—a five year old at the

time of the offense—by the cheeks. The grab or squeeze was sufficient to cause prominent, deep red marks, which lasted several days, and subsequent bruising which lasted for approximately one week. William complained of pain and soreness for three days resulting from the grab. Howe therefore caused physical injury to William. The fact-finder could conclude, based on the evidence, that he did so in a manner that was both cruel and violent.

{¶ 39} The juvenile court could certainly conclude that Howe would have been aware that he would be inflicting physical injury on a child by grabbing and squeezing a child's face with such force as to leave red marks that caused pain and a bruise lasting a week. This is not an act by an adult that is in any way consistent with an accident or "playing around." Moreover, Howe conceded that State's Exhibit 1 depicted abuse, was caused by someone with strength, and that he could not understand why anyone would do such a thing to a child.

{¶ 40} Even if the cases on which Howe relies—which state a heightened standard for "abuse" in the context of felony child endangering—applied here, which they do not, those cases refer not only to causing "serious" physical harm as abuse, but also refer to cruelty to a child's physical, moral, or mental well-being as abuse. *Haley*, 2013-Ohio-4123 at ¶ 10; *Cooper*, 2002-Ohio-617 at ¶ 16. Any factfinder could have found beyond a reasonable doubt that Howe's act towards William constituted a form of "cruelty to a child's physical, moral or mental well-being." *Cooper* at ¶ 16. Thus, even if we were to adopt Howe's proposed definition of "abuse," which we do not, his conviction of child endangering would still be supported by sufficient evidence. Likewise, to the extent the ordinary meaning of "abuse" includes "cruel" behavior, the factfinder could conclude that Howe's actions towards William were cruel.

{¶ 41} Accordingly, the evidence, if believed, constituted abuse pursuant to R.C.

2919.22(B)(1). Other than the issue of whether the state's evidence was sufficient to demonstrate abuse, Howe challenges no other aspect of the state's proof in support of his conviction. Accordingly, we find that the state presented sufficient evidence of abuse to support a misdemeanor conviction of child endangering under R.C. 2919.22(B)(1).

{¶ 42} For the same reasons, we conclude that Howe's conviction for child endangering was supported by the greater weight of the evidence. In fact, overwhelming evidence supported Howe's conviction. Accordingly, we overrule Howe's first and second assignments of error.

{¶ 43} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.