[Cite as *State v. Ward*, 2026-Ohio-305.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2025-04-034 |
| vs. | : | OPINION AND JUDGMENT ENTRY 2/2/2026 |
| ADAM TRISTAN WARD, | : | |
| Appellant. | : | |
| | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2024-02-0263


Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Michele Temmel, for appellant.


# **O P I N I O N**


**SIEBERT, J.**

{¶ 1} Adam Tristan Ward appeals his convictions for strangulation, abduction, and rape. He argues his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence due to conflicts in witness testimonies that

undermine the credibility of the State's witnesses. His arguments, in large part, rely on his own trial testimony and what he asserts did and did not occur. Put simply, no purported conflict in the evidentiary record or credibility issue that Ward identifies comes close to fulfilling the high standard of review in this case. His arguments on appeal represent nothing more than an attempt to relitigate his guilt. Ultimately, we conclude Ward's "conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the [S]tate." *State v. Nelson*, 2024-Ohio-5750, ¶ 23 (12th Dist.), citing *State v. Lunsford*, 2011-Ohio-6529, ¶ 17 (12th Dist.).

**Factual and Procedural Background**

{¶ 2}   The victim in this case, Alice[1], was Ward's fiancé, and they shared a home at the time of Ward's offenses. Alice testified that after coming home from work, Ward attempted to make her a drink and show her a guitar he worked on for her that day. But at the same time, Alice's daughter called, interrupting Ward's proffer of the drink and guitar. Alice took the call, which displeased Ward. After finishing the call, Ward accused Alice of being disrespectful. Alice and Ward's testimony as to the series of events that occurred after that phone call, while consistent in some details, conflict in many other respects. We summarize both Alice's and Ward's trial testimony and any other relevant testimony or admitted evidence.

*Alice's Testimony*

{¶ 3}   Alice testified that during their subsequent argument, Ward put his right arm around the front of Alice's neck and lifted her in the air. Alice heard "cracking" in her neck and saw "stars" before losing consciousness multiple times. Alice also claims to have heard Ward say he "was going to have to hide the body" before the first time she did so.

---

1. "Alice" is a pseudonym adopted for this opinion for the purposes of privacy and readability. *See State v. Cansler*, 2025-Ohio-2558, ¶ 1, fn. 1 (12th Dist.); *Supreme Court of Ohio Writing Manual* 115 (3rd Ed. 2024).

Upon regaining consciousness, Alice found Ward attempting to give her CPR. Alice had a severe headache, was choking on blood, had urinated on herself, and could not see out of her swollen left eye. Alice repeatedly asked Ward throughout the night to let her go to the hospital, but Ward told her that her injuries were not severe, that she would be fine, and that he needed to figure out how to get her medical care without hospital staff and law enforcement assuming he assaulted her.

{¶ 4} Ward proceeded to retrieve a revolver from underneath their bed and pulled the trigger multiple times, but Alice only heard the pistol's hammer "click" and no shot was fired. Ward then walked over to her, showed her a bullet in the revolver's cylinder and pressed their heads together. Ward again pulled the gun's trigger multiple times, but the gun's hammer again only "clicked." After unsuccessfully attempting to dial 911 before Ward took and broke her phone, Alice separated herself from Ward and sent an emergency text to her mother from the bathroom using a smart watch.

{¶ 5} Upon returning to the bedroom, Alice found Ward attempting to asphyxiate himself with a belt and later a cord, but Alice cut the cord to prevent this. Alice then went to her car and attempted to drive away, but Ward wrestled her out of the car and threw her onto the snow-covered ground. He then took her back inside their home. Alice testified that Ward subsequently took off her clothes, and vaginally raped her with his penis, a sexual aid device, and via oral sex. Alice repeatedly told Ward to stop and take her to the hospital.

{¶ 6} By the time Ward took Alice to the hospital, approximately nine hours had transpired since Alice took her daughter's call.

*Ward's Testimony*

{¶ 7} Ward testified he injured Alice by accident. According to him, after Alice's phone call with her daughter, he and Alice were "spooning" on the bed when he attempted

to pull her head up to kiss her ear and neck. At that point, Alice started making a choking sound, prompting Ward to stop and have her stand up to make sure she was okay. Ward, it should be noted, worked as a surgical nurse. Upon standing up, however, Alice crumpled to the hardwood floor. At that point, Ward panicked, retrieved his revolver, and contemplated suicide. Ward testified, however, that he never loaded the gun. When Alice woke up, Ward went over to her and used the gun—pointed vertically at the ceiling—to test her eyesight by seeing if she could follow the barrel of the gun. Ward asserted he never held his and Alice's heads together and pulled the trigger. Ward also asserted he never attempted to give Alice CPR because she never stopped breathing.

{¶ 8}  When Alice fully regained consciousness, Ward put the gun away and attempted to help Alice clean up from the incident. Ward testified that he (1) took Alice's phone when she attempted to call 911; (2) accidentally broke the phone after taking it from Alice and tossing it aside; (3) attempted to asphyxiate himself with a belt and later a cord; (4) wrote a suicide note; (5) removed Alice from her car when Alice attempted to drive away; and (6) took Alice back to the bedroom, performed vaginal and oral sex on her, and proffered to use a sexual aid device on her (which she refused). Ward testified their sexual activity stopped when Alice asked to go to the bathroom, and she did not ask him to stop at any other point.

{¶ 9}  The prosecution pressed Ward on the notion that many of his purported actions throughout the evening were not consistent with accidentally hurting Alice. In response, Ward repeatedly asserted he has PTSD and "freak[ed] out" after Alice went unconscious. Despite her apparent injuries, Ward did not believe Alice needed an ambulance and immediate hospital care that would not only be expensive, but inevitably "turn [the night's events] into a bigger thing." Ward worried about the ramifications the incident could have on his life and nursing license but asserted those were not reasons

he initially refused to take Alice to the hospital. Ward repeatedly testified that he and Alice needed to "calm down" before taking her to the hospital. When asked why Ward thought Alice would be receptive to his sexual advances under these circumstances, Ward stated that while Alice was "still kind of irritated . . . her mood had changed. She wasn't crying." However, Ward admitted that he was "not making the best decisions at this point."

*Other Testimony and Evidence*

{¶ 10} Photos taken during the subsequent criminal investigation showed multiple drops of blood on the house floors, a more substantial amount of blood on Alice and Ward's bedroom carpet, and bloodied towels and rags in the bathroom trash. Pictures also showed blood on Alice's and Ward's clothes.

{¶ 11} Ward's suicide note—which did not mention Alice—stated that he "was always trying to be better, but unfortunately, it [was] not something [he] was able to do" and that he had "known that [he was a] failure as a father for a while." The letter also stated, "This is not anyone's doing but my own." The note ended with "Goodbye, Adam [Ward]. I am the real monster."

{¶ 12} Lindsay Krammes, a physician's assistant at the University of Cincinnati's Emergency Department, treated Alice at the hospital on the night of the offense. She testified Alice had a facial fracture and bruising which caused her left eye to swell shut. Although Alice had no bruises on the front of her neck consistent with strangulation when she treated Alice, Krammes did identify bruising to Alice's forearms and to the right side of the neck near her upper chest—displayed in photos taken within a couple days of her leaving the hospital.

{¶ 13} Shannon Parker, the sexual assault nurse who examined Alice, testified that Alice had lacerations in her vagina but could not say when they occurred or whether the lacerations were caused by consensual or nonconsensual penetration. Phillip Irion, a

forensic scientist with the Ohio Bureau of Criminal Investigation, testified that DNA testing on swab samples showed Ward's DNA on Alice's vagina, underwear, and neck. However, Irion asserted such testing could not show when or how Ward's DNA got there.

{¶ 14} Finally, Detective Nick Hornback, who investigated the offense, testified at trial. Hornback interviewed Ward multiple times after the incident. At trial, Hornback testified that Ward never told him he was trying to "scooch" Alice up towards him in the bed. Instead, Ward told Hornback he used a "rear naked choke" on Alice as "part of what he called breath play, which is choking that is sexual in nature." Hornback also testified that despite not writing it in his report, Ward admitted that Alice repeatedly told him to stop while Ward performed sexual acts on her.

**Standards of Review**

{¶ 15} Ward asserts his convictions were not supported by sufficient evidence or were against the manifest weight of the evidence. We note that "although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

{¶ 16} "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Madden*, 2024-Ohio-2851, ¶ 31 (12th Dist.), citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61

Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 17} Meanwhile, "[a] manifest weight of the evidence challenge examines the 'inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *Madden* at ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 18} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.). "[I]nconsistencies in the evidence alone do not mean that a decision is against the manifest weight of the evidence." *State v. Deck*, 2021-Ohio-3145, ¶ 21 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

**First Assignment of Error – Strangulation**

{¶ 19} In his first assignment of error, Ward argues his conviction for strangulation is against the manifest weight of the evidence because the evidence does not show he "knowingly" strangled Alice. Ward points to his testimony that he and Alice were merely "cuddling and spooning" before he reached down to bring Alice closer to him so he could kiss her neck and stopped when she began making a choking noise. Ward also claims there is no "direct evidence" of Alice suffering any serious physical harm such as bruising

at the neck or medical scans. Ward's arguments are meritless.

*Applicable Law*

{¶ 20} Strangulation occurs when one knowingly "cause[s] serious physical harm to another by means of strangulation or suffocation." R.C. 2903.18(B)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "[W]hether a person acts knowingly can . . . be determined from all the surrounding facts and circumstances, including the doing of the act itself." *State v. Hilton*, 2015-Ohio-5198, ¶ 20 (12th Dist.). In turn, "strangulation or suffocation" is defined as "any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth." R.C. 2903.18(A)(1).

*Analysis*

{¶ 21} As apparent from the summaries above, Alice's testimony differed greatly from Ward's. She testified Ward put his arm around her neck and lifted her in the air after arguing. Ward's trial testimony also differed from that of Detective Hornback, who stated that Ward initially admitted to choking Alice as part of sexual activity. Moreover, both Alice and Ward testified that when Ward put his arm around Alice's neck (regardless of how or for what reason), Alice began to make a choking sound before losing consciousness, sustaining a head injury, and urinating herself. Being rendered unconscious, standing alone, is enough to constitute serious physical harm. *State v. Barron*, 2022-Ohio-102, ¶ 91 (12th Dist.) (affirming defendant's conviction for various offenses, including felonious assault).

{¶ 22} If the jury believed Alice's testimony regarding the series of events leading to her losing consciousness, the jury needed no more evidence, direct or otherwise, to

conclude that Ward impeded Alice's normal breathing by applying pressure to her throat or neck. And, if the jury believed Alice, it could certainly conclude that Ward did so knowingly. He was aware that putting his arm around her neck and lifting her in the air by her neck, especially in the heat of an argument, would probably cause the exact result it did—impeding Alice's breathing to the point she choked and lost consciousness. The jury's conclusion that Ward acted "knowingly" would only be boosted by the fact Ward's own testimony confirmed he was a surgical nurse with a working knowledge of physical anatomy.

{¶ 23} To reiterate the introduction of this opinion, Ward's "conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the [S]tate." *Nelson*, 2024-Ohio-5750, at ¶ 23, citing *Lunsford*, 2011-Ohio-6529, at ¶ 17. "Even though this court may consider the credibility of the witnesses in conducting our manifest-weight analysis," Ward's conflicting testimony, by itself, does not give us "any justifiable reason to second-guess the credibility determinations" of the jury's verdict, especially after considering the other evidence in this case. *Id.*

{¶ 24} We overrule Ward's first assignment of error.

**Second Assignment of Error – Abduction**

{¶ 25} Ward asserts his conviction for abduction with a firearm specification is against the manifest weight of the evidence. Specifically, he argues the State did not prove, beyond a reasonable doubt, that he "knowingly restrained the liberty of [Alice] by means which create a risk of physical harm, namely with an operable firearm." In support, he again cites to his own testimony and argues he "never used a firearm to restrain the liberty of [Alice because] [i]t was not capable of firing because it was unloaded." He also claims that Alice's injuries combined with the "stressful situation . . . *could* have easily [led

Alice to] believe[] the gun was loaded when in fact it was not." (Emphasis added.) We easily reject Ward's assertions as meritless.

*Applicable Law*

{¶ 26} Abduction occurs when one knowingly, "[b]y force or threat, restrain[s] the liberty of another person under circumstances that create a risk of physical harm to the victim or place[s] the other person in fear." R.C. 2905.02(A)(2). The requirement that Ward acted "knowingly" for this charge is the same as discussed in Ward's assignment of error for his strangulation conviction. *See* R.C. 2901.22(B).

{¶ 27} Ward's indictment for abduction included a firearm specification which asserted Ward "had a firearm on or about [his] person or under [his] control" when he committed the offense. R.C. 2941.145. "Firearm" is statutorily defined as "any deadly weapon capable of expelling or propelling one or more projectiles . . . [and] includes an unloaded firearm . . . [or one that] can readily be rendered operable." R.C. 2923.11(B)(1).

*Analysis*

{¶ 28} If the jury believed Ward walked over to Alice, showed her a bullet in the revolver's cylinder, pressed their heads together, and then pulled the gun's trigger multiple times, while pointing the gun at their heads, that would indeed be a stressful situation. But it would not be a stressful situation that would lead to Ward's acquittal. Instead, hearing and believing such testimony would virtually assure that the jury would find the State met its burden to prove Ward knowingly abducted her with a firearm. After all, the jury could conclude, based on Alice's testimony that when Ward held Alice's head against his, while pointing a gun at their joined heads, he was probably aware that action and those circumstances caused him to restrain her liberty by force. Likewise, the jury could conclude Ward was probably aware such a restraint created a risk of physical harm, or at the very least, placed Alice in fear. And he used a gun to do so.

{¶ 29} Whether the gun was actually loaded or in working order mattered not one jot. The plain language of Ohio law for the firearm specification makes the gun's "loaded" or "unloaded" status irrelevant. Alice's testimony, if believed, supports the firearm specification because Alice testified Ward had a firearm on his person or under his control during this "stressful situation."

{¶ 30} As a result, none of Ward's arguments hold any legal weight. Ward's abduction conviction was not "a manifest miscarriage of justice," much less one so grave that it must be reversed. Once again, the jury chose to believe Alice's testimony and the corroborating evidence of the State. Ward's arguments categorically fail to meet the "exceptional" circumstances our standard of review requires.

{¶ 31} Ward's second assignment of error is overruled.

**Third Assignment of Error - Rape**

{¶ 32} Once again, Ward argues the evidence presented at trial precluded the jury from determining that he raped Alice. Ward summarizes his argument on appeal as follows: "[Alice] said she was raped. Mr. Ward said she never said no and he stopped when she asked him to. Besides [Alice's] testimony, there is no other evidence [Alice] was raped. No confession. No physical evidence. No corroborating evidence." And once again, Ward's arguments are meritless.

*Applicable Law*

{¶ 33} Rape occurs when an offender "engage[s] in sexual conduct with another. . . [and] the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).[2] "Purposely" is defined as a person's "specific intention to

---

2. "Sexual conduct" is defined as "vaginal intercourse between a male and female . . . cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

- 11 -

cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "This bifurcated definition of 'purpose' is intended to encompass both those crimes where the result must be intended, such as causing death, in the crime of murder, and those offenses where the act itself is all that must be intended, such as engaging in sexual conduct in the crime of rape." *State v. Wilkins*, 64 Ohio St.2d 382, 386 (1980).

*Analysis*

{¶ 34} Ward's arguments regarding his rape conviction—similar to those made regarding his strangulation and abduction convictions—fly in the face of the evidentiary record and Ohio precedent. Ward does not contest that he engaged in sexual activity with Alice by vaginal intercourse with his penis and by oral sex. Ward's intent to engage in sexual conduct with Alice satisfies that he acted "purposely." Moreover, the record is replete with evidence that Ward compelled such sexual activity with force or threat of force: (1) Alice testified that she repeatedly told him to stop; (2) Alice had bruising on her forearms (consistent with being forcibly held down); (3) Hornback testified that Ward acknowledged Alice repeatedly asked him to stop; (4) Ward handled a firearm in front of Alice that evening (regardless of whether it was loaded); (5) Ward contemplated shooting at least himself that night; (6) Ward forcibly removed Alice from her vehicle after she repeatedly asked to go to the hospital; and (7) Ward admitted he was "not making the best decisions" when he chose to engage in sexual activity with Alice that evening. The list could go on.

{¶ 35} Ward's final assignment of error is overruled.

**Conclusion**

{¶ 36} Ward's arguments throughout this appeal essentially assert his convictions

were against the manifest weight of the evidence because there was no *definitive* proof that he committed these crimes against Alice. But such proof was not required for the jury to find him guilty beyond a reasonable doubt because Ohio law recognizes that "everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt." R.C. 2901.05(E). Upon review, Ward's conviction and his arguments on appeal present no grounds for us to second guess the jury's determination that Ward strangled, abducted, and raped Alice.

{¶ 37} Judgment affirmed.

HENDRICKSON, P.J., and BYRNE, J., concur.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Matthew R. Byrne, Judge

/s/ Melena S. Siebert, Judge